UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTY L. BOULIS-GASCHE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:08-CV-450 |
| | ) | (VARLAN/GUYTON) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation regarding the disposition by the District Court of the plaintiff's Motion For Judgment On The Pleadings [Doc. 11], and the defendant's Motion For Summary Judgment. [Doc. 15]. Plaintiff Christy L. Boulis-Gasche seeks judicial review of the decision of the Administrative Law Judge ("ALJ"), the final decision of the defendant Commissioner.

## BACKGROUND

Plaintiff was 49 years of age when the ALJ issued his decision (Tr. 30, 58). She has one year of college and special training in drafting (Tr. 94-95), with work experience as a computer drafter (CAD) and as a factory production worker (Tr. 86). She alleges that she has been disabled since August 27, 2001, due to muscle spasms, headaches, vision problems (Tr. 86), along with pain

in neck and shoulder and seizures, with panic attacks (Tr. 667). She asserts that these problems are the result of a brain surgery she had after an on the job injury.

## **MEDICAL RECORD EVIDENCE**

The relevant medical record evidence has been summarized accurately by the defendant [Doc. 16], as follows:

Plaintiff went to the emergency room after a container fell on her head at work in June 2001 (Tr. 162-67). X-rays were normal, and she was diagnosed with a cervical strain and prescribed pain medication and a soft collar (Tr. 162-72). Plaintiff began physical therapy that month (Tr. 230).

Also that month, plaintiff saw orthopedist Dr. Bell, who diagnosed cervical strain and a shoulder contusion, and recommended physical therapy (Tr. 180). An MRI of the neck in July and a shoulder x-ray in August were normal (Tr. 174, 177), and he cleared her for work in mid-July (Tr. 178). Dr. Bell ultimately referred plaintiff to pain specialist Dr. Wagner (Tr. 176).

Dr. Hooker conducted a normal EMG nerve study of plaintiff's left arm in September (Tr. 182-84). Plaintiff also saw Dr. Hoffman in September, who found muscle tightness and multiple trigger points on examination, diagnosed myofascial pain syndrome in her left shoulder and upper back, and recommended physical therapy and medication (Tr. 554-56).

Plaintiff was discharged from physical therapy in October, when she rated her pain at about four out of ten in intensity (Tr. 187). In November, Dr. Hoffman related that plaintiff had

tried various modalities with some relief, and he recommended physical and aquatic therapy, exercise and possibly trigger point injections (Tr. 552). In December, Dr. Hoffman reported that plaintiff was doing very well (Tr. 551).

Plaintiff complained of increased neck stiffness and headaches in January 2002. Dr. Hoffman prescribed medication and recommended physical and aquatic therapy (Tr. 550).

Plaintiff went to physical therapy again from March through April, when she rated her pain at about three out of ten in intensity (Tr. 238-39, 249). In May, Dr. Hoffman gave plaintiff trigger point injections and recommended more physical therapy, and in June, he found improvement upon clinical exam (Tr. 548-49).

In July, 2002, plaintiff had surgery to remove a brain tumor (Tr. 260-65). Her surgeon, Dr. Vargas, restricted her from strenuous activities, lifting more than five pounds and driving, and he also prescribed seizure medication (Tr. 259, 265).

In September, plaintiff complained of headaches and vision problems, but denied problems with seizures, and her exam was essentially normal (Tr. 499). Dr. Vargas began to wean her off her seizure medication and prescribed pain medication for her headaches (Tr. 499).

In November, plaintiff reported intermittent headaches and vision problems, but denied seizures, and her exam was essentially normal (Tr. 497). Plaintiff saw neurologist Dr. Brewer in December, when she alleged blurred vision, headaches, nausea, dizziness, sensitivity to light and noise, transposed speech, abnormal hand sensations, neck pain, and panic attacks (Tr. 486-87). Dr. Brewer's exam was essentially normal, and she suspected migraine/vascular headaches,

3

as well as possible panic attacks, cervical spine disease, and carpal tunnel syndrome (Tr. 486-487). She prescribed pain medication and muscle relaxant (Tr. 487).

Plaintiff saw opthalmologist Dr. Taylor in January 2003 (Tr. 416). He found abnormal but correctable visual acuity, and apart from plaintiff's potential susceptibility to glaucoma, he had no other concerns upon examination (Tr. 416-17). This same month, Dr. Hoffman opined that plaintiff could work "a desk-type job that did not revolve [sic] any repetitive motions with her left shoulder or a lot of lifting or overhead activities" (Tr. 544).

In April, plaintiff had muscle tightness and pain, but fair neck rotation and full strength in her left arm (Tr. 543). Dr. Brewer changed plaintiff's migraine prescription. Plaintiff reported that the new medication worked but she still had "some visual disturbances" (Tr. 485). She started physical therapy again that month (Tr. 432, 449); upon initial examination, she had full range of motion in her shoulders, and equal, almost full strength in her arms (Tr. 432). Plaintiff reported improvement through June, including a pain rating of two out of ten upon discharge (Tr. 434, 445, 447-48). Plaintiff had Botox injections in her muscles in August (Tr. 539-40).

In September, plaintiff reported pain relief with Lortab, but said she did not like to take it often because it made her "feel a little bit fuzzy headed" (Tr. 537). Dr. Hoffman nonetheless recommended that she increase her use of Lortab (Tr. 537-38). Later that month, plaintiff reported a "drunk-like" sensation from the Lortab and said it made her unable to do much (Tr. 535). In November, though, Dr. Hoffman related that plaintiff was doing well with a dosage of Nortab that did not make her "too 'fluffy headed'" (Tr. 533). A head MRI in November 2003 showed only minimal post-operative change and no acute abnormality (Tr. 456).

4

The next month, plaintiff complained of frequent headaches and speech difficulties, and Dr. Brewer recommended an EEG to determine whether she was having seizures (Tr. 496). An EEG later that month was "essentially normal," with occasional changes that were "potentially epileptogenic but not definite" (Tr. 484). Also that month, Dr. Hoffman reported that plaintiff received considerable pain relief with Lidoderm patches and heat wraps (Tr. 531-32).

In January 2004, Dr. Vargas reviewed plaintiff's EEG results and urged her to follow-up with Dr. Brewer for further investigation (Tr. 494). He explained that he had not drawn a connection between her 2001 head trauma, her headaches and her brain tumor, and further noted that plaintiff's description of her alleged seizures consisted of anxiety and slightly garbled speech with no alteration in consciousness (Tr. 494).

In February, Dr. Hoffman scheduled plaintiff for another round of Botox injections in order to "get her back to the more functional level that she has been at in the past and really we had good results" (Tr. 530). In March, Dr. Franklin examined plaintiff and found that she had normal visual acuity and normal peripheral vision with corrective lenses; he felt that she "should be able to perform most occupations without limitation due to her eyes" (Tr. 457).

In April, 2004, state agency physician Dr. Doster opined that plaintiff could do light work (Tr. 462-66).

That same month, she reported that her pain on average was about four out of ten in intensity (Tr. 526). Dr. Davis provided additional Botox injections at that time (Tr. 527-28).

In August, Dr. Hoffman felt that plaintiff was doing very well (Tr. 522). In September 2004, Dr. Brewer wrote that plaintiff might or might not suffer from seizures (Tr. 467-

5

72). That same month, plaintiff reported that on bad days, her pain was at six out of ten in intensity (Tr. 519). She had more Botox injections that month; Dr. Davis noted at that time that she was being treated for depression with Paxil (Tr. 520-21).

In December, Drs. Lepannen and Dougherty conducted an EMG and nerve conduction study of plaintiff's arms, and concluded that the results were "consistent with, but not specifically diagnostic of carpal tunnel syndrome," rated as severe in the right wrist and mild in the left (Tr. 477).

In January 2005, Dr. Hoffman expressed reluctance to fill out a disability form without having plaintiff complete a functional capacity evaluation first, but felt that she could not be gainfully employed based on her education (Tr. 515). He also related that Lortab provided 70% pain relief for up to four hours (Tr. 515).

In March, Dr. Brewer diagnosed migraine headaches and carpal tunnel syndrome (Tr. 620). She also noted that plaintiff reported a diagnosis of Reynaud's syndrome from an unidentified specialist (Tr. 620). Dr. Brewer increased plaintiff's seizure medication and prescribed a muscle relaxant (Tr. 620). An MRI of plaintiff's brain in March showed no acute findings or signs of a recurrent tumor (Tr. 488, 492). Shortly thereafter, Dr. Vargas opined that her neck, shoulder and arm symptoms were related to a dynamic thoracic outlet syndrome, and not carpal tunnel syndrome (Tr. 492).

In April and May, 2005, Dr. Hoffman noted plaintiff's mood, and referenced that she had tried Cymbalta and Paxil without good relief. Dr. Hoffman prescribed different mental health medication and considered a referral to Dr. Sanders (Tr. 507-08, 511). A June EEG was "essentially

6

normal," though Dr. Bridges felt that the results did not exclude a diagnosis of a seizure disorder (Tr. 628).

In August, plaintiff had nearly full muscle strength and equal range of motion in both arms (Tr. 613). Dr. Hoffman altered her muscle relaxant regimen, continued her anxiety medication and referred her to Dr. Sanders for an evaluation (Tr. 610).

Dr. Hoffman also offered his opinion on plaintiff's physical abilities in August, 2005 (Tr. 557-64). He felt that plaintiff could sit for four hours, stand/walk for one hour, not work without changing positions periodically, never lift with her left arm, and lift over fifty pounds occasionally and over twenty pounds frequently with her right arm (Tr. 559-60). He opined that she could not do a full-time job, that her symptoms interfered with her attention and concentration, that she could not tolerate low work stress and that her depression contributed to her limitations (Tr. 562). He also stated that she would need multiple unscheduled breaks during the workday, and that she would likely miss more than three days of work a month (Tr. 562-63). He restricted her from working around heights and temperature extremes (Tr. 563), and indicated that she did not have side effects from her use of Lortab (Tr. 561). He based his opinion on plaintiff's chronic myofascial pain and poor range of motion in her left shoulder, as well as a tight muscle, and related his opinion back to September 2001 (Tr. 557, 563).

In October, plaintiff rated her shoulder pain at four out of ten in intensity, and complained of passing out and headaches three to four times weekly (Tr. 606). A CT of the head that same month was essentially normal (Tr. 630). Also in October, Dr. Brewer made reference to psychiatric evaluations and related medication, as well as plaintiff's report that she felt good (Tr.

7

617). Dr. Brewer increased her seizure medication based upon plaintiff's reports of episodes of loss of awareness, and also prescribed medication for "nervousness and nausea, as well as dizziness" (Tr. 617). Plaintiff's date last insured was in December 2005 (Tr. 25).

In February 2006, plaintiff reported that she was seeing Dr. Sanders for her mental health treatment [no record of which is in the record] (Tr. 602). Dr. Hoffman found her to be stable (Tr. 602). In April, plaintiff reported that Dr. Sanders had discharged her, and she denied being depressed (Tr. 598). She also stated that she had rejected Dr. Brewer's recommendation for surgery (Tr. 598). Dr. Hoffman recommended physical therapy (Tr. 598). The next month, plaintiff reported no improvement with physical therapy and sought return to a prior medication regimen, under which "she was doing fairly well and was able to control her pain at least enough not to interfere too much with her lifestyle and raising her children" (Tr. 595).

Consultant neurologist Dr. Henry examined plaintiff in May 2006 regarding her allegations of blurred vision, headaches, neck and shoulder pain, and seizures (Tr. 582). Plaintiff said her seizures made her "eyes . . . roll up and she feels like she is flopping from side to side" and that she had them "every couple of weeks" (Tr. 582). She also described two different types of headaches, one of which was sometimes associated with vomiting (Tr. 583). Dr. Henry suspected exaggeration of her neck symptoms, but found that her left shoulder was crepitous on examination (Tr. 583, 585). He found poor motor strength in her hands and arms, but no atrophy and noted that she did not give full effort for testing (Tr. 585). He noted that she "appeared very depressed and very tense" (Tr. 586). He wrote that she had significant depression problems and referenced a statement she had made about ineffectiveness of mental health medication, but no independent

8

notation about this existed in his report (Tr. 586).  Dr. Henry also opined that plaintiff could do light work with limitations in her ability to push and pull; change posture; and reach overhead (Tr. 587-90).

In May, 2006, Dr. Hoffman signed a report prepared in part by physician's assistant Kingry which set forth that plaintiff could not reach overhead or use her left arm or shoulder for prolonged periods of time (Tr. 593-94).  In July, Dr. Vargas compared a recent brain MRI to one from 2005 and found no appreciable changes (Tr. 591-92).  In August and September, Dr. Hoffman changed plaintiff's anxiety medication regimen (Tr. 631-32, 635).

In October, 2006, Dr. Hoffman opined on plaintiff's capabilities again (Tr. 639).  He felt that she could sit for four hours out of eight; stand/walk for one hour; rise and move around hourly for about ten to fifteen minutes; not lift more than five pounds occasionally with her left arm; and not use her left arm constantly or repetitively (Tr. 641-42).  He stated that plaintiff could not tolerate low stress; would need to take multiple unscheduled breaks during the workday; would miss more than three days of work every month and also needed to avoid temperature extremes and heights (Tr. 645).  He cited her chronic pain, myofascial pain, left shoulder and neck pain, as well as her decreased range of motion and weakness in her left shoulder, muscle tightness and headaches, and related his opinion back to September 2001 (Tr. 639-40, 645).  He also indicated that emotional factors contributed to her limitations, but offered no explanation (Tr. 644).

## TESTIMONY EVIDENCE

At the hearing before the ALJ on August 23, 2006, the plaintiff testified that her greatest medical problem was her neck, followed by seizures, vision problems, left arm, carpal tunnel syndrome and anxiety. She also said she had Reynaud's disease and thus could not work in the cold (Tr. 666-69). She said she had seizures from once to twice a week, each lasting for a total of ninety to 120 minutes (Tr. 672). However, she added that the seizures never happened in public and that she had not had any seizures when she traveled out of state on recent occasions (Tr. 663-64, 678).

Plaintiff also alleged blurry and double vision (Tr. 672), and headaches, which occurred three or four times a week and lasted for three or four days each (Tr. 673). Plaintiff said that she had panic attacks about two or three times a month, and that they lasted two or three hours (Tr. 676-77). She further stated that she had memory and concentration lapses (Tr. 679).

Plaintiff said that she could sit for fifteen minutes, stand for twenty minutes, walk a mile and lift about two or three pounds (Tr. 679-80). She said she did some chores, the dishes and the laundry and a little bit of cooking and infrequent shopping (Tr. 680). She said she was able to give herself manicures (Tr. 682-83).

## DECISION OF THE ALJ

The ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 27, 2001 through her date last insured of December 31, 2005.

3. Through the date last insured, the claimant had the following combination of impairments: myofascial pain syndrome; bilateral carpal tunnel syndrome; possible seizure disorder. Therefore she had a "severe" impairment.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of medium work.

6. Through the date last insured, the claimant's past relevant work as a computer aided drafter did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant was not under a "disability", as defined in the Social Security Act, at any time from August 27, 2001, the alleged onset date, through December 31, 2005, the date last insured.

(Tr. 25-30).

The Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 14-17). Therefore, the ALJ's decision stands as the Commissioner's final decision subject to judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## STANDARD OF REVIEW

If the ALJ's findings are supported by substantial evidence based upon the record as a whole, they are conclusive and must be affirmed. Warner v. Commissioner of Social Security, 375 F.3d 387 (6th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Siterlet v. Secretary of Health and Human Services, 823 F.2d 918, 920 (6th Cir. 1987). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ or whether the reviewing judge may have decided the case differently. Crisp v. Secretary of Health and Human Services, 790 F.2d 450, 453 n.4 (6th Cir. 1986); and see Dorton v. Heckler, 789 F.2d 363, 367 (6th Cir. 1986) (holding that, in a close case, unless the Court is persuaded that the Secretary's findings are "legally insufficient," they should not be disturbed). The Court may not review the case de novo, resolve conflicts in evidence, or decide questions of credibility. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

## ANALYSIS

Plaintiff argues that the ALJ erred in finding that she retained the residual functional capacity to perform a full range of medium work, because the ALJ (1) improperly evaluated her

12

bilateral carpal tunnel syndrome, (2) did not account for work interruption caused by her seizures, panic attacks and headaches, (3) ignored postural limitations, and (4) disregarded mental limitations. Plaintiff also argues that the ALJ erred by giving "great weight" to the opinions of Dr. Doster, while discounting the opinions of Dr. Hoffman.

The plaintiff, however, apparently does not object to the ALJ's finding that the plaintiff's "statements concerning the intensity, persistence and limiting effects of her symptoms are not entirely credible" (Tr. 28). The ALJ also concluded: "the undersigned cannot find the claimant fully credible with regard to her allegations" (Tr. 28).

The Commissioner asserts that substantial evidence supports the ALJ's residual functional capacity finding for medium work. The Commissioner argues that this finding was consistent with the medical evidence of record.

The Court finds that the amount of weight given by the ALJ to the opinion of Dr. Hoffmann was appropriate. The ALJ may not assign controlling weight to a treating physician's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; <u>Walters v. Commissioner of Social Security,</u> 127 F.3d 525, 530 (6th Cir. 1997).

In the present case, the ALJ identified the significant amount of medical evidence in the record that conflicted with Dr. Hoffmann's extreme opinion about plaintiff's limitations (Tr. 29-30).

The Court agrees with the defendant that the plaintiff's reliance on SSR 96-8p is

13

misplaced, because she does not identify any work-related function that was not considered by the ALJ. Ruling 96-8p states that "the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." The ruling specifies that "when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."

The ALJ considered all of the physical and mental limitations and restrictions of specific functional capacity alleged by plaintiff and the ALJ did not fail to consider her alleged carpal tunnel syndrome, seizure, fatigue and headaches. Moreover, plaintiff has not explained how these alleged impairments prevent her from doing her past work as a computer-aided drafter (Tr. 106).

Plaintiff argues that the ALJ failed to properly analyze her mental impairment when he neglected to follow the relevant procedure set forth in the regulations. See 20 C.F.R. § 404.1520a. The first step in this analysis calls for the determination of whether a claimant has a medically determinable mental impairment. Subsequent steps must be followed only if the initial investigation yields a positive response. See 20 C.F.R. § 404.1520a(b)(1).

In the present case, the ALJ reasonably determined that there was no evidence in the record to support a finding that her panic disorder was a medically determinable impairment. As the ALJ pointed out, plaintiff never sought any mental health treatment for her alleged condition (Tr. 27). Moreover, no doctor clearly or consistently diagnosed plaintiff with a panic disorder.

14

The ALJ similarly found that while Dr. Hoffman prescribed antidepressant medication in April and May 2005, the record did not show that plaintiff's depression met the regulatory durational requirement (Tr. 27). 20 C.F.R. § 404.1509. Specifically, in April 2006, plaintiff denied being depressed and reportedly had been discharged from mental health care treatment (Tr. 598). The Court, therefore, agrees with the defendant that the ALJ was not obligated to do more under the regulations, as he reasonably concluded that the evidence did not show a severe mental impairment of the requisite duration.

The plaintiff has the burden of proving her entitlement to benefits. Boyles v. Secretary of Health and Human Services, 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)), and the burden of proving that she is unable to perform her past relevant work. Smith v. Secretary of Health and Human Services, 893 F.2d 106, 108 (6th Cir. 1989). I find, however, in the present case that plaintiff has not met that burden.

Accordingly, I find that the ALJ properly reviewed and weighed all of the medical source opinions, the objective medical findings, and plaintiff's credibility to determine that she could perform a full range of medium work. Substantial evidence supports the ALJ's findings and conclusions. Therefore, it is hereby **RECOMMENDED**[1] that the plaintiff's Motion For Judgment

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).

On The Pleadings [Doc. 11] be **DENIED** and that the Commissioner's Motion For Summary Judgment [Doc. 15] be **GRANTED**.

Respectfully submitted,

    s/ H. Bruce Guyton    
United States Magistrate Judge
